# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Joseph A. Dickson |
| v. | : | Mag. No. 12-6700 (JAD) |
| PORFIRIO PAREDES<br>ROSA MARMOL<br>LUIS MARTINEZ | : | **CRIMINAL COMPLAINT** |

FILED SEP 18 2012 JOSEPH A. DICKSON, USMJ

I, Anthony Gonzalez, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Postal Inspector with the United States Postal Inspection Service, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

Anthony Gonzalez, Postal Inspector
United States Postal Inspection Service

Sworn to before me and subscribed in my presence,
September 18, 2012 at Newark, New Jersey

HONORABLE JOSEPH A. DICKSON
UNITED STATES MAGISTRATE JUDGE          Signature of Judicial Officer

ATTACHMENT A

### Count One
### (Conspiracy to Defraud the United States)

From at least as early as in or around March 2011 through in or around September 2012, in the District of New Jersey and elsewhere, defendant

PORFIRIO PAREDES
ROSA MARMOL
and
LUIS MARTINEZ

did knowingly and intentionally conspire and agree with others to embezzle, steal, purloin, and knowingly convert to their use and the use of others, money of the United States, specifically United States Treasury checks, contrary to Title 18, United States Code, Section 641, in violation of Title 18, United States Code, Section 371.

### Counts Two through Five
### (Theft of Government Property)

On or about the dates set forth below, defendant

PORFIRIO PAREDES
ROSA MARMOL
and
LUIS MARTINEZ

did knowingly embezzle, steal, purloin, and knowingly convert to his use and the use of others, money of the United States, specifically United States Treasury checks, in violation of Title 18, United States Code, Sections 641 and 2, as follows:

| Count | Defendant | Approximate Date | Approximate Amount |
|---|---|---|---|
| 2 | PAREDES and MARMOL | August 31, 2011 | $22,862 |
| 3 | PAREDES and MARMOL | December 22, 2011 | $7,991 |
| 4 | PAREDES and MARTINEZ | April 12, 2012 | $6,139.55 |
| 5 | PAREDES and MARTINEZ | April 30, 2012 | $8,427 |

ATTACHMENT B

I, Anthony Gonzalez, have been a Postal Inspector with the United States Postal Inspection Service for approximately seven years, and I have been personally involved in the investigation of this matter. The information contained in this Complaint is based on my personal knowledge and on information obtained from other sources, including: a) statements made or reported by various witnesses with knowledge of relevant facts; b) my review of publicly available information relating to the defendants; and c) my review of business records, bank records and other documents and evidence obtained through Court orders, subpoenas and other sources. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of the investigation. Where the content of documents and the actions, statements, and conversations of individuals are recounted herein, they are recounted in substance and in part.

1.  At all times relevant to this Complaint:

    a.  The standard form used by United States citizens to file individual federal income tax returns was the Individual Income Tax Return Form 1040 ("Form 1040"). Taxpayers could file Form 1040s either in paper for or electronically.

    b.  For electronically-filed Form 1040s, the U.S. Treasury was capable of tracing the specific Internet Protocol ("IP") address[1] from which a particular Form 1040 was filed.

    c.  On a Form 1040, taxpayers were required to report, among other things, their wages, withholdings, and applicable tax credits. Based on the information reported in Form 1040s, the United States Treasury Department either required taxpayers to provide additional taxes or paid taxpayers with tax refunds.

    d.  The United States Treasury Department (the "U.S. Treasury") paid tax refunds in the form of checks, which were mailed to taxpayers (the "Tax Refund Treasury Checks") or electronically deposited into accounts designated by the taxpayers.

---

[1] Typically, computers or devices on the Internet are referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period, and each number is a whole number between 0 and 254. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each Internet Service Provider ("ISP") a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISPs employ dynamic IP addressing, that is, they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time, and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Therefore, if a customer's ISP employs dynamic IP addressing, the customer's IP address can change over time, even though the customer remains the same and maintains the same account with the ISP.

2

    e. Stolen Identity Refund Fraud ("SIRF") was a common type of fraud committed against the United States government that resulted in over $2 billion in losses annually to the United States Treasury.[2]

Background on SIRF

2. From my training and experience, I know that SIRF schemes are a significant and growing problem across the United States. SIRF schemes generally share a number of hallmarks:

    a. First, SIRF perpetrators obtain personal identifying information, including Social Security Numbers and dates of birth, from unwitting individuals, who often reside in the Commonwealth of Puerto Rico.[3]

    b. Second, SIRF participants complete Form 1040s using the fraudulently-obtained information, and falsifying wages earned, taxes withheld and other data (the "Fraudulent Form 1040s"). Perpetrators use data to make it appear that the "taxpayers" listed on the Fraudulent Form 1040s are entitled to tax refunds – when in fact, the various tax withholdings indicated on the Fraudulent Form 1040 taxes have not been paid by the listed "taxpayers," and no refunds are due.

    c. Third, SIRF perpetrators direct Tax Refund Treasury Checks generated by the Fraudulent Form 1040s to locations they control or can access, in various ways, including:

        i. Listing addresses on Fraudulent Form 1040s that the perpetrators could access, and employing runners to remove Tax Refund Treasury Checks from mailboxes at those addresses;

        ii. Enlisting corrupt mail carriers to divert Tax Refund Treasury Checks from the mail stream before delivery; and

        iii. Designating refunds to be electronically deposited into bank accounts under their control.

    d. Fourth, with Tax Refund Treasury Checks now in hand, SIRF perpetrators generate cash proceeds. Certain SIRF perpetrators sell Tax Refund Treasury Checks at a discount to face value. In turn, the buyers then cash the Tax Refund Treasury Checks, either themselves or using straw account holders, by cashing

---

[2] SIRF is also targeted at state taxing authorities in much the same way. Fraudulent state tax returns are submitted in the names of individuals who are not the actual filers in order to obtain fraudulently issued state tax refunds based on false representations of wages and taxes withheld, among others.

[3] Puerto Rican citizens are issued Social Security numbers, but are not required to pay Federal income tax unless they derive income from United States-based companies or from the United States government. Therefore, Social Security numbers assigned to Puerto Ricans are a valuable commodity for perpetrators of SIRFs, because these Social Security numbers are normally not already associated with a Form 1040.

checks at banks or check cashing businesses, or by depositing checks into bank accounts. When cashing or depositing Tax Refund Treasury Checks, SIRF perpetrators often present false or fraudulent identification documents in the names of the "taxpayers" to whom the checks are payable.

3. The multiple steps in a SIRF scheme often require the participation of numerous individuals, who usually occupy specific and distinct roles in the scheme.

Summary of the Investigation

4. Federal law enforcement agencies, recognizing that SIRF was a serious problem, created a multi-agency task force in New Jersey led by investigators from the United States Postal Inspection Service and the Internal Revenue Service with support from the United States Secret Service, Homeland Security Investigations, and the Drug Enforcement Administration (the "New Jersey Task Force").

5. An investigation led by the New Jersey Task Force has revealed that between at least as early as 2007 and the present, dozens of individuals in the New Jersey and New York area have been engaged in a large-scale, long running SIRF scheme (the "Scheme"). In total, the Scheme has caused more than 8,000 Fraudulent Form 1040s to be filed, seeking more than approximately $65 million in tax refunds, with losses to the U.S. Treasury of more than approximately $11.3 million.

6. The Scheme was carried out by JOSE TORRES, a/k/a "Jose Quilestorres" ("TORRES"), ROBERTO DIAZ, ELIAN MATLOVSKY, PORFIRIO PAREDES, ROSA MARMOL, LUIS MARTINEZ, ENNIO GUZMAN, ALEJANDRO JAVIER, ROBERT PINSKI, MICHAEL SENATORE, ROSARIO TERZULLI, MANUEL RODRIGUEZ, RIGOBERTO TORRES ("R. TORRES") and others (collectively, the "Conspirators").

7. Each Conspirator played a specific role in the Scheme. For example:

   a. **Obtaining Personal Identifying Information from Puerto Rican Citizens:** TORRES, RODRIGUEZ, and others obtained personal identifiers, such as dates of birth and social security numbers, belonging to Puerto Rican citizens.

   b. **Creating Fraudulent Form 1040s:** TORRES, RODRIGUEZ and others used those identifiers to create Fraudulent Form 1040s, which falsely reported wages purportedly earned by the "taxpayers" and taxes purportedly withheld, to create the appearance that the "taxpayers" were entitled to tax refunds. Of course, the amounts were fraudulent.

   c. Moreover, the Fraudulent Form 1040s submitted by TORRES, RODRIGUEZ, and others listed the same employers and home addresses for numerous different "taxpayers."

d. **Filing the Fraudulent Form 1040s:** The Fraudulent Form 1040s made in furtherance of the Scheme were created and filed electronically. By tracing the specific IP addresses that submitted the electronically-filed Form 1040s, law enforcement officers learned that just a handful of IP addresses created many of the Fraudulent Form 1040s used in the Scheme. These Fraudulent Form 1040s in turn led to the issuance of Tax Refund Treasury Checks that the Conspirators obtained, sold, cashed, and spent.

e. **Obtaining the Fraudulently-Issued Tax Refund Treasury Checks:** TORRES, RODRIGUEZ and others then gained control of Tax Refund Treasury Checks, in various ways, which followed the pattern of a classic SIRF scheme:

   i. Sometimes, Conspirators obtained Tax Refund Treasury Checks by bribing mail carriers to intercept checks and deliver them to other Conspirators. One such mail carrier, BENNIE HAYNES, who delivered mail along a route in Somerset, New Jersey, has previously been charged. In exchange for cash payments, HAYNES gave Tax Refund Treasury Checks to Conspirators. These Conspirators gave the checks to TORRES and others. In turn, TORRES then sold these checks to yet other Conspirators. Tax Refund Treasury Checks mailed to addresses along HAYNES's mail route in Somerset, New Jersey were deposited into accounts controlled by DIAZ, MATLOVSKY, RODRIGUEZ and R. TORRES.

   ii. TORRES and others also purchased "mail routes," that is, lists of addresses covered by a single mail carrier, from other Conspirators, including DIAZ. Again, once the mail route was purchased, TORRES and others applied for Tax Refund Treasury Checks, inserted addresses along the mail route as the purported home addresses of the "taxpayers," and obtained the Tax Refund Treasury Checks sent to the addresses.

   iii. In other instances, the Conspirators applied for checks using addresses otherwise controlled by, or accessible by, certain Conspirators, and collected the checks after they were delivered to those addresses. For example, during the course of the Scheme, hundreds of Tax Refund Treasury Checks were mailed to just a few different addresses in a few different towns, including Nutley, Somerset and Newark, New Jersey, and Shirley, New York.

f. **Selling the Tax Refund Treasury Checks to Other Conspirators:** TORRES and others then sold Tax Refund Treasury Checks to DIAZ, PAREDES, JAVIER, RODRIGUEZ, and others.

g. **Depositing and Cashing the Tax Refund Treasury Checks:** After buying the Tax Refund Treasury Checks from TORRES and others, DIAZ, PAREDES,

    JAVIER, RODRIGUEZ, and others deposited and cashed the checks. Again, the Conspirators used several methods:

    i. They induced third parties (the "Straw Account Holders"), including MATLOVSKY and GUZMAN, to open bank accounts at various banks in New Jersey and elsewhere. Once the Tax Refund Treasury Checks were deposited into the Straw Account Holders' accounts or accounts controlled by Conspirators, DIAZ, MATLOVSKY, GUZMAN PAREDES, JAVIER, PINSKI, RODRIGUEZ, R. TORRES, MARMOL, MARTINEZ and others caused proceeds of the fraud to be withdrawn, and spent those funds or transferred funds to other Conspirators.

    ii. RODRIGUEZ, PAREDES, SENATORE, PINSKI, JAVIER, TERZULLI and others also obtained proceeds from Tax Refund Treasury Checks by causing checks to be cashed at check cashing institutions, and then causing the proceeds to be deposited into bank accounts controlled by Conspirators.

    iii. They bought, or tried to buy, check cashing businesses, so that they would have more stable venues for cashing Tax Refund Treasury Checks. TORRES, DIAZ, and GUZMAN, among others, discussed purchasing a check cashing business to further the Scheme.

<u>Making Connections Between Conspirators – the Scope of the Scheme</u>

8. As set forth above, each Conspirator played a particular role in the Scheme. Not every Conspirator engaged with every other Conspirator, and so certain Conspirators are charged in separate complaints. But computer analysis, along with statements from cooperating witnesses, intercepted communications, consensually-recorded meetings, and subpoenaed records, have revealed the web of connections between and among the Conspirators.

9. As just a couple of examples, law enforcement has identified specific IP addresses linked to TORRES (who is charged by separate Complaint), which were used to file thousands of Fraudulent Form 1040s.

10. One IP address linked to TORRES was discovered after law enforcement officers introduced a confidential informant ("CI-1") to DIAZ. Law enforcement officers provided CI-1 with a mail route for addresses in Cliffside Park, New Jersey (the "Cliffside Park Mail Route"). In or around June 2011, CI-1 gave DIAZ the Cliffside Park Mail Route. CI-1 told DIAZ that the mail carrier for the Cliffside Park Mail Route was complicit in the scheme, and would remove Tax Refund Treasury Checks from the mail stream for the Conspirators.

11. Shortly thereafter, DIAZ provided the Cliffside Park Mail Route to TORRES. Subsequently, dozens of Fraudulent Form 1040s were created from a single IP address, using addresses along the Cliffside Park Mail Route ("IP Address 1").

12. Law enforcement officers then analyzed IP Address 1, and discovered that IP Address 1 had created a total of approximately 2,033 Fraudulent Form 1040s, all bearing Puerto Rican names. Moreover, other Conspirators, including DIAZ, MATLOVSKY, GUZMAN, PAREDES, and R. TORRES, had deposited or caused to be deposited Tax Refund Treasury Checks, which had been issued based on Fraudulent Form 1040s filed from IP Address 1, in furtherance of the Scheme.

13. On or about August 19, 2011, DIAZ caused a Tax Refund Treasury Check he obtained from TORRES to be deposited into an account MATLOVSKY controlled. The IP address that filed the Fraudulent Form 1040 for this check ("IP Address 2") was also associated with the filing of approximately 1,648 Fraudulent Form 1040s. Moreover, PAREDES and R. TORRES, too, deposited or caused to be deposited Tax Refund Treasury Checks that resulted from Fraudulent Form 1040s filed from IP Address 2.

14. In total, Tax Refund Treasury Checks resulting from Fraudulent Form 1040s filed utilizing the IP addresses linked to TORRES were deposited by DIAZ, MATLOVSKY, GUZMAN, R. TORRES, and PAREDES, among others.

15. Consensually recorded conversations further linked the Conspirators together. During recorded conversations with a Cooperating Witness ("CW-1"), TORRES referred to PINSKI and JAVIER, and stated that he believed PINSKI and JAVIER had been arrested and/or were under investigation for engaging in the Scheme.

16. In addition, intercepted communications laid bare yet other connections between Conspirators. Law enforcement officers maintained a wiretap on PINSKI's telephone facility for approximately three months in or around 2012. During conversations intercepted through this wiretap, PINSKI, JAVIER, and SENATORE engaged in dozens of conversations relating to the Scheme, and discussed, in granular detail, the specifics of SIRFs, and of the Scheme in particular.

<u>Law Enforcement Officers Intercept More than $22 Million in Tax Refund Treasury Checks, Mitigating the Harm Caused by the Scheme</u>

17. During the course of the investigation, members of the New Jersey Task Force identified certain "hot spots" of activity related to the Scheme – that is, Conspirators were directing millions of dollars worth of Tax Refund Treasury Checks to just a few towns and cities in and around New Jersey. New Jersey Task Force members then interacted with United States Postal Service employees in these hot spots, and identified the characteristics of Tax Refund Treasury Checks connected to the Scheme. As a result of these efforts, more than $22 million in Tax Refund Treasury Checks that had been issued by the U.S. Treasury were not delivered to the Conspirators or others, but rather were interdicted by law enforcement officers.

### Certain Conspirators Engage in Lavish Personal Spending with Stolen Public Money

18. Several of the Conspirators used the proceeds of the fraud to enjoy a lavish lifestyle. As just one example, DIAZ, who purportedly worked in the grocery business, resided in a house worth over $1.6 million, and paid over $13,000 per month – from accounts associated with the fraud – in mortgage payments on this house; he gambled over $250,000 at casinos in New Jersey and elsewhere; he purchased two Mercedes-Benz automobiles; and he took high-end vacations to Miami and elsewhere, spending thousands of dollars a night on luxury hotels.

19. As another example, MATLOVSKY, who was a school teacher, charged approximately $123,000 on a single credit card in just one year, including such charges as:

    a. Tens of thousands of dollars in hotel and airfare for numerous luxury vacations to Cancun, Miami Beach, Panama City, Atlantic City, Fort Lauderdale, Puerto Rico, the Dominican Republic, Israel, and elsewhere;

    b. Over $4,000 in shopping on a single day;

    c. Restaurant tabs of over $1,300 for a single meal; and

    d. Tens of thousands of dollars in high-end furniture.

### The Roles of the Defendants

20. PAREDES resided in or around Hazelton, Pennsylvania. MARMOL resided in or around Grand Rapids, Michigan. MARTINEZ resided in or around Matthews, North Carolina.

#### PAREDES

21. PAREDES's role in the Scheme was to buy Tax Refund Treasury Checks from other Conspirators, including TORRES, and to cause them to be negotiated at various locations across the country, including New York, Pennsylvania, Michigan and North Carolina. Over the course of the conspiracy, PAREDES caused to be deposited or cashed over $1.8 million in Tax Refund Treasury Checks.

22. In particular, PAREDES caused to be deposited or cashed substantial volumes of Tax Refund Treasury Checks in Michigan using MARMOL, and in North Carolina using MARTINEZ.

23. Law enforcement officers have also reviewed PAREDES's own personal tax returns. Notwithstanding that PAREDES caused more than $1.8 million in Tax Refund Treasury

Checks to be deposited into various bank accounts, and notwithstanding that more than $730,000 was deposited into certain accounts under PAREDES' control, PAREDES claimed only approximately $27,000 in wages for each tax year between 2009 and 2011. In each of these years, PAREDES received a tax refund based on these claimed wages.

PAREDES and MARMOL

24. From at least as early as August 2011 to in and around February 2012, MARMOL, at the direction of PAREDES, deposited or caused to be deposited checks into business accounts held in the name of Tienda Guadalajara Jalisco, which was MARMOL's employer and which purported to be a check cashing business and a supermarket located in or around Grand Rapids, Michigan ("Tienda Guadalajara"). During that time period, approximately $1.17 million in Tax Refund Treasury Checks were deposited into bank accounts controlled by Tienda Guadalajara. None of these approximately $1.17 million in Tax Refund Treasury Checks, however, had been mailed to addresses in Michigan. Rather, the checks had been mailed to purported recipients as far away as Rhode Island, Florida, and Oklahoma.

25. After Tax Refund Treasury Checks were deposited into bank accounts controlled by Tienda Guadalajara, the vast majority of this money was then withdrawn. In almost all instances, the money was then re-deposited into PAREDES's bank accounts. The deposits into PAREDES' accounts were made at bank branches located within blocks of the branches of Tienda Guadalajara's banks, from which the money had been withdrawn.

26. Bank tellers have identified MARMOL, an employee of Tienda Guadalajara, as the individual who deposited cash into PAREDES's accounts. Indeed, certain of the cash deposited into PAREDES's bank accounts was still wrapped in straps from Huntington Bank, one of the financial institutions where Tienda Guadalajara's bank accounts were located.

27. An analysis of telephone numbers associated with PAREDES has revealed that PAREDES's phone numbers engaged in more than 140 calls with MARMOL in just one month, between in or around January 2012 and in or around February 2012. During this month, approximately $73,000 in Tax Refund Treasury Checks were deposited into Tienda Guadelejara's accounts, and approximately $38,000 in cash was deposited into PAREDES's accounts from locations in or around Michigan.

28. In total, MARMOL deposited or caused to be deposited at least approximately $1,170,151.48 in Tax Refund Treasury Checks, which she received from PAREDES in connection with the Scheme.

    a. From at least in or around August 2011, to in or around October 2011, MARMOL deposited or caused to be deposited approximately 119 Tax Refund Treasury Checks totaling approximately $756,897.10, into accounts at Chemical Bank held by Tienda Guadalajara, for which account MARMOL was a signatory.

9

b. From at least in or around October 2011, to in or around February 2012, MARMOL deposited or caused to be deposited approximately 67 Tax Refund Treasury Checks totaling approximately $413,254.38, into an account at Huntington Bank held by Tienda Guadalajara, for which MARMOL was a signatory.

c. As just two examples, on or about December 22, 2011, MARMOL deposited at the direction of PAREDES approximately one Tax Refund Treasury Check into a Tienda Guadalajara account at Huntington National Bank in Grand Rapids, Michigan, totaling approximately $7,991 ("Deposit 1"); and again on or about August 31, 2011, MARMOL deposited approximately three Tax Refund Treasury Checks at PARDES' direction totaling approximately $22,862 into a Tienda Guadalajara account at Chemical Bank ("Deposit 2").

d. These two transactions, among others, demonstrate how Tax Refund Treasury Checks, which PAREDES deposited or caused to be deposited were connected to other Conspirators. Specifically, PAREDES caused numerous Tax Refund Treasury Checks to be deposited, which had been applied for – using Fraudulent Form 1040s – from IP addresses linked to TORRES. The tax return associated with the Tax Refund Treasury Check deposited in Deposit 1 was filed from IP Address 1, associated with TORRES on or about July 24, 2011, and was addressed to a taxpayer purportedly residing in Nutley, New Jersey. Similarly, a tax return associated with one of the Tax Refund Checks deposited in Deposit 2 was filed from IP Address 2, associated with TORRES on or about March 8, 2011, and was addressed to a taxpayer purportedly residing in Shirley, New York.

PAREDES and MARTINEZ

29. Similarly, PAREDES caused to be deposited or cashed substantial volumes of Tax Refund Treasury Checks in North Carolina using MARTINEZ to deposit checks into accounts controlled by MARTINEZ. In total, MARTINEZ deposited or caused to be deposited at least approximately 98 Tax Refund Treasury Checks, which he received from PAREDES in connection with the Scheme.

a. From at least as early as August 2011, to at least as late as May 2012, MARTINEZ deposited or caused to be deposited approximately 59 Tax Refund Treasury Checks totaling approximately $485,891.74, into an account at Bank of America held in the name of "Edwin Rosario Multiservices," which was under the control of MARTINEZ.

b. From at least in or around March 2012, to in or around May 2012, MARTINEZ deposited or caused to be deposited approximately 18 Tax Refund Treasury Checks totaling approximately $128,413.10, into two accounts at Bank of America held by "Jorge Luis Martinez" d/b/a/ "Martinez Investments," which was under the control of MARTINEZ.

    c. From at least in or around August 2011, to in or around April 2012, MARTINEZ deposited or caused to be deposited approximately 21 Tax Refund Treasury Checks totaling approximately $138,735.94, into accounts at Bank of America held by "Luis Martinez" and/or "Luis Martinez" d/b/a/ "Lujokatal," which was the control of MARTINEZ.

    d. As just two examples, on or about April 30, 2012, MARTINEZ deposited or caused to be deposited approximately one Tax Refund Treasury Check at the direction of PAREDES, into his personal account at Bank of America in North Carolina, totaling approximately $8,427; and on or about April 12, 2012, MARTINEZ deposited or caused to be deposited approximately one Tax Refund Treasury Check totaling approximately $6,139.55 into a business account in the name of "Lujokatal" at Bank of America, which MARTINEZ controlled. Both of these Tax Refund Treasury Checks were made payable to individuals purportedly residing in New Jersey.

30. Like with MARMOL, MARTINEZ deposited Tax Refund Treasury Checks at PAREDES' direction, and then withdrew proceeds to then be deposited into accounts controlled by PAREDES. MARTINEZ would make or cause such deposits to be made into PAREDES' accounts at bank branches in North Carolina. PAREDES would then withdraw or access those funds from bank branches in Pennsylvania and New Jersey.

31. An analysis of telephone numbers associated with PAREDES has revealed that PAREDES's phone numbers engaged in more than 700 phone calls with numbers associated with MARTINEZ between in or around August 2011 and in or around March 2012.

<u>PAREDES' ARREST and ADMISSIONS</u>

32. On September 17, 2012, PAREDES was arrested by local law enforcement in Palisades Park, New Jersey. At the time of his arrest, he was in possession of three Tax Refund Treasury Checks made out to other individuals, totaling $24,700 in value, which bear classic hallmarks of a SIRF scheme. All three checks are dated October 7, 2011, and are made out to individuals purportedly living in neighboring houses in Nutley, New Jersey, along the same street.

33. After PAREDES was advised of his rights and signed a written Miranda waiver, he made the following statements in substance and in part during a post-arrest interview, among others, which are summarized below:

    a. PAREDES admitted that his source for Tax Refund Treasury Checks is an individual in Bronx, New York, known to him as "Sandi," who matches the description of TORRES. PAREDES has obtained Tax Refund Treasury Checks from "Sandi" at a car dealership in Bronx, New York, Albert's Auto Sales, a business known to be affiliated with TORRES.

11

b.  On occasion, PAREDES has obtained Tax Refund Treasury Checks from "Sandi" directly, but more often, "Sandi" directed other Conspirators to provide the Tax Refund Treasury Checks to PAREDES.

c.  After obtaining the Tax Refund Treasury Checks, PAREDES contacted other individuals to deposit or cash the checks. In particular, PAREDES admitted that he has been providing MARMOL and MARTINEZ Tax Refund Treasury Checks periodically since in or around 2011.

d.  PAREDES admitted that he has received approximately 20-30% of each Tax Refund Treasury Check as profit. Thus, the amounts MARMOL and MARTINEZ deposited into PAREDES' accounts reflected, not the full face value amount of the Tax Refund Treasury Checks, but a discounted amount that was comprised of PAREDES' share plus the share PAREDES would use to pay other Conspirators.

e.  PAREDES admitted that he withdrew proceeds from accounts under his control, provided some of the cash to Conspirators in Bronx, New York, including "Sandi."

f.  PAREDES admitted that on at least two occasions in 2012, including as recently as September 15, 2012, he has provided BMW X5 sport utility vehicles to Conspirators in exchange for Tax Refund Treasury Checks. PAREDES admitted he obtained the vehicles from car dealerships associated with MARTINEZ in North Carolina, and delivered them to Conspirators at Albert's Auto Sales in Bronx, New York in exchange for Tax Refund Treasury Checks. On or about Saturday, September 15, 2012, PAREDES provided a BMW X5 to "Sandi" at Albert's Auto Sales and received twice the value of the vehicle in Tax Refund Treasury Checks, approximately $65,000. PAREDES provided the Tax Refund Treasury Checks he received in exchange for the vehicles to MARTINEZ, who travelled to North Carolina to deposit them.

34. On or about September 17, 2012, PAREDES placed a telephone call to MARMOL, which was consensually recorded and monitored by law enforcement. During that call, MARMOL inquired as to when PAREDES would be sending more Tax Refund Treasury Checks to be deposited in Michigan, as they had done before. PAREDES advised MARMOL that he would be sending three Tax Refund Treasury Checks to her by FedEx.

## FORFEITURE ALLEGATIONS

1. The allegations contained in paragraphs 1 through 34 of this Complaint are hereby realleged and incorporated by reference for the purpose of noticing forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. The United States hereby gives notice to the defendants that, upon conviction of the offenses charged in this Complaint, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any and all property, real or personal, which constitutes or is derived from proceeds obtained directly or indirectly traceable to such offenses, including but not limited to the following a sum of money equal to at least $1,887,912.98, for which the defendants are jointly and severally liable.

3. If by any act a result of any act or omission of the defendants, any of the property subject to forfeiture described in paragraph 2 herein:
    a. cannot be located upon the exercise of due diligence;
    b. has been transferred or sold to, or deposited with, a third party;
    c. has been placed beyond the jurisdiction of the court;
    d. has been substantially diminished in value; or
    e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of such defendants up to the value of the forfeitable property described in paragraph 2.